IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

MARCH 1997 SESSION

FILED

October 10, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 02C01-9610-CC-00363 |
| Appellant, | * | LAUDERDALE COUNTY |
| VS. | * | Hon. Joseph H. Walker, Judge |
| JOHN H. GILLON, | * | (Criminally Negligent Homicide; Aggravated Assault; Assault--State Appeal) |
| Appellee. | * | |

For Appellee:

J. Thomas Caldwell
Attorney at Law
114 Jefferson Street
Ripley, TN  38063

For Appellant:

Charles W. Burson
Attorney General & Reporter

Deborah A. Tullis
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN  37243-0493

Mark Davidson
Assistant District Attorney General
302 Market Street
P.O. Box 562
Somerville, TN  38063

OPINION FILED: _____

REVERSED AND REMANDED

GARY R. WADE, JUDGE

## OPINION

The defendant, John H. Gillon, was convicted of the criminally negligent homicide of Terry Phillips, the aggravated assault of Lemmie Haynie, and the assault of James Haynie. The trial court imposed sentences of one year, two years, and eleven months, twenty-nine days respectively. When, however, the defendant filed a motion for judgment of acquittal or, in the alternative, a new trial, the trial court acquitted the defendant on all counts. The state appeals from that judgment.

At about dusk on the evening of April 6, 1995, there was an automobile accident at the intersection of Highway 51 and Industrial Road in Lauderdale County involving the defendant and each of the three victims. A witness, Montel Maners, Jr., was traveling south on the divided, four-lane Highway 51 when he "heard a noise and saw a ... white cloud" on the southbound lanes. When he successfully drove through the smoke, he saw two vehicles: "an El Camino, in a ditch, and a pickup truck on its side." Maners stopped to assist and first determined that the two people inside the El Camino were conscious and breathing. As he approached the pickup truck, which was flipped on its passenger side on the edge of a ditch, he saw the defendant exit the truck. Maners recalled asking him if he was okay and the defendant responded, "Yeah. I was driving" and something like "[d]id you see that person pull out in front of me?"

Maners testified that the occupant on the passenger side of the truck did not have a pulse and was not breathing. A third occupant of the truck was also seriously injured. Maners could hear ambulance sirens and decided to leave the passengers in the truck until more help arrived. At that point, he recalled that the defendant said, "Well, I was driving." Although he did not see the collision, Maners

2

estimated that he was 100 to 150 yards away when the accident occurred. When at the scene, he specifically remembered the defendant saying that the El Camino had "just pulled right out in front" of him.

Maners testified that Highway 51 was a four-lane road accommodating north and south traffic. He stated that Industrial Road was two-lane road, intersecting Highway 51.

Maners described the accident scene as follows:

[Each car was] on the west shoulder of 51 going southbound lane on the west in the ditch and the road right [as] it crosses Industrial Road ...; the pickup truck was [lying] on its passenger side facing northbound and from the road itself, it was probably 20, 30 feet from the actual road in the ditch, and the other truck was probably 50 to 70 feet, the El Camino sitting on its wheels facing -- and it was just about in the center of the ditch facing southbound.

Trooper Willie Thompson, who investigated the accident, testified that the defendant identified himself as the driver of the truck. He recalled that the defendant was very disoriented and did not remember what had happened. Trooper Thompson remembered that it "was still fairly light" when he arrived at the scene. The trooper determined that the defendant, who he believed was traveling west on Industrial Road, would have traveled across "two lanes of [Highway 51] traffic that are northbound, the median, and then the inside lane of the southbound lane" before the collision. He described the accident scene at Highway 51 as "a long, straight stretch of road both ways, where you can see a long distance ...." The trooper concluded that the El Camino, occupied by the victims Lemmie and James Haynie, was traveling south on Highway 51 and that the defendant, accompanied by the deceased victim Phillips and Davis, was traveling from the east on Industrial

3

Road. He found that the El Camino had left about fifteen feet of skid marks in the southbound lane of Highway 51.[1]

William Davis, a passenger in the defendant's truck, testified that he had spent the afternoon at the defendant's mother's house doing construction work. He remembered that around 6:00 P.M., the defendant drove his truck to Crockett County to pick up the deceased victim, Terry Phillips. Davis recalled that he was in the middle, Phillips was on the passenger side, and the defendant was driving. According to Davis, the three men were "just riding" with no particular destination in mind when the defendant stopped to purchase a twelve-pack of beer. The last thing Davis remembered was that the defendant put the beer in a cooler in the bed of the truck before driving away from the store, which is located about a mile and a half from the accident scene. Davis described the lighting conditions as "dusk dark." In a coma for four days after the accident, Davis had no other recollection of the events surrounding that day.

James Haynie, the driver of the El Camino, testified that he and his father were traveling south on Highway 51 when his father warned that a "truck wasn't going to stop up the road...." He recalled driving "further on down the road and the next thing I [knew], I was in Memphis." Haynie estimated his car's speed at 55 to 60 miles per hour. He did not specifically recollect seeing the truck at any time before the accident. When asked if he was "looking at [his] father," Haynie replied, "Right." James Haynie suffered a fractured skull, had stitches in his elbow, and had a crushed kneecap, which had to be removed.

---

[1]The trooper testified in great detail using a diagram of the roads. The diagram was not made a part of the record; much of the trooper's testimony made little sense in written form.

His father, Lemmie Haynie, testified that he was a passenger in his son's El Camino when the wreck occurred. As the two approached the intersection, Haynie saw the defendant's truck traveling Industrial Road, "moving pretty fast." He recalled that he was 50 to 70 feet from the intersection when he told his son that the truck might not stop. He estimated the driving time from the intersection at ten to twelve seconds. He acknowledged that a Co-op at that intersection blocked the view from Highway 51 to the Industrial Road but could not otherwise explain his son's failure to see the defendant's truck. Haynie, who suffered a broken leg in the accident requiring the insertion of pins and rods, rebroke the leg several months later. Still on crutches at the time of trial, he had not been able to work.

Deborah Underwood, who was traveling north on Highway 51 at the time of the accident, saw the defendant's truck cross the two north-bound lanes about 150 to 200 feet in front of her. She described the truck's speed as "fast" and testified that it did not slow down before it reached the intersection. She saw no indication that either the El Camino or the truck braked or skidded before the collision took place.

Nioka Laurence Ottinger, the defendant's mother, testified that Billy Davis was driving her son's truck when the men left her residence shortly before the accident. She claimed "it was getting dark" at that time.

The defendant, who claimed that it took him about two weeks to regain his memory of the incident, testified that Davis was driving and that he was sitting in the middle. He contended that Davis slowed down at the intersection but did not stop. He remembered that after the collision, he had climbed out the back window of the truck's cab. He testified that he did not remember talking to Maners or Officer

5

Thompson.  The defendant insisted that he never "saw the other vehicle at all ...."

He remembered looking one way and Davis looking the other but denied seeing any

oncoming traffic.  When asked on direct whether he remembered whether he was

the driver or the passenger, he testified as follows:

> I really believe that I was in the middle because when I woke up -- I mean, if I'd been driving, you know, I would have been looking, you know, wouldn't have been any way that I could have looked, you know, all the way with two people, you know, right in the cab.  And I know I've seen it over and over in my head because when I come to it was a sound that Billy was making.  It was like he was trying to breathe and I just won't ever forget the sound.  It was just, you know, trying to breath through water or something, just real hard to breathe.  And he was laid in my lap and when I slip up, he laid over on Terry and I got out.

On cross-examination, the following exchange occurred:

Defendant:   I remember riding in the truck and I remember looking but when we had the accident, as far as I -- the best I can recollect, I was not driving 'cause I--

Prosecutor:   Do you remember that or are you just assuming that?

Defendant:   ... The best I can remember, I know whenever we stopped, I know that Billy was on one side of me and Terry was on the other and I was in the middle.

Prosecutor:   Whenever you stopped?

Defendant:  Whenever the--whenever the accident occurred -- whenever--like I woke up.  I was just kind of out of it....

Prosecutor:  So, you -- you're saying the only thing you recall is waking up after you came to a stop sideways, turned sideways, after you flipped?

Defendant:   I remember ... like coming down and looking down the highway....  We like slowed up at the first intersection like where the stop sign is, we come down like to the road and Billy was looking back up the road and he pulled on --

Prosecutor:   Who was driving?

Defendant:  Billy was driving.

Prosecutor:  So now you say you remember Billy driving.

Defendant:   I remember that I was sitting in the middle and I remember looking down the highway.  He must have been driving.

Based on this testimony, the jury found the defendant guilty of the criminally negligent homicide of Terry Phillips, the aggravated assault of Lemmie Haynie, and the assault of James Haynie.  The trial court sentenced the defendant to one year for the homicide, two years on the aggravated assault, and eleven months, twenty-nine days, on the assault.  Almost two and a half months later, the trial court granted the defendant an acquittal on all three convictions.

The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction; that is, whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  After a conviction, the state is entitled to the strongest legitimate view of the evidence and any reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A motion for judgment of acquittal presents a question of law. State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983).  The trial judge is concerned only with the "legal sufficiency of the evidence and not with the weight of the evidence." Id.; see also State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).  The evidence must be viewed in the light most favorable to the state. Adams, 916 S.W.2d at 473.  "An appellate court must apply the same standard as a trial court

when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal." Id. at 473.

A Class D aggravated assault occurs when the defendant recklessly commits an assault and causes serious bodily injury. Tenn Code Ann. § 39-13-102(a)(2) (Supp. 1993). Assault occurs when a person "[i]ntentionally, knowingly, or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1). Reckless conduct, a requirement for each of the two offenses, is defined as follows:

> [A] person ... acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c) (emphasis added).

Criminally negligent homicide is "[c]riminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212. Criminal negligence is defined as follows:

> [A] person ... acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(d) (emphasis added). The comments to this section describe subsection(d) as "in line with case law of Tennessee on the degree of negligence required for criminal culpability. The proposition that criminal liability be based on a higher degree of negligence than that required for civil liability is well

8

settled." Sentencing Commission Comments to Tenn. Code Ann. § 39-11-302(d) (citing Claybrook v. State, 51 S.W.2d 499 (Tenn. 1932); Hiller v. State, 50 S.W.2d 225 (Tenn. 1932); Copeland v. State, 285 S.W. 565 (Tenn. 1926)).

It is undisputed that the death of Terry Phillips and the injuries to the Haynies were caused by the automobile wreck. The issue is whether the evidence is sufficient to sustain a finding of recklessness for the assault convictions or criminal negligence for the homicide conviction. "[W]hat differentiates recklessness from criminal negligence is the degree of awareness--that is, recklessness includes awareness, but disregard, of a risk while criminal negligence involves a lack of awareness when one should be aware." State v. Butler, 880 S.W.2d 395, 398 (Tenn. Crim. App. 1994). If an element of an offense is that the defendant acted with criminal negligence, "that element is also established if a person acts intentionally, knowingly, or recklessly." Tenn. Code Ann. § 39-11-301(a)(2). The definitions of negligence and recklessness both require a "substantial and unjustifiable risk" for which the disregard of (for recklessness) or ignorance of (for negligence) "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-11-302(c), (d). In this case, the central issue is whether the defendant's conduct amounted to a "gross deviation from the standard of care."

In our view, the proof presented at trial supported a finding of the recklessness necessary to support each of the two assault convictions. A reasonable juror could have concluded that the defendant, as driver of the vehicle, disregarded the stop sign at the intersection. There was evidence that the defendant, a resident of that general area of the county, was aware of the four-lane

highway, the stop sign, and the distance from his point of entry through the median to the point of impact. Yet, despite having two clear opportunities, the defendant never slowed his truck as he drove over three lanes of traffic and a median strip. This, in our view, warranted the jury's conclusion that the defendant was aware of and consciously disregarded the risk that a collision would occur. These facts are similar to those considered by this court in State v. Ramsey, 903 S.W.2d 709, 712 (Tenn. Crim. App. 1995): "[t]here is no other conclusion but that the defendant was aware of the substantial and [un]justifiable risk that an accident could ensue ... and that he consciously disregarded that risk by driving in such a manner."

Our determination that the defendant was reckless in the operation of his truck leads us to the inevitable conclusion that the defendant was also criminally negligent. See Tenn. Code Ann. § 39-11-301(a)(2). Thus, there was sufficient evidence to support all three convictions.

The defendant makes the argument that the proof, while adequate to establish civil liability, does not reach the level of negligence required to sustain a criminal conviction. He relies on a long line of cases which hold that a mere accident will not suffice to establish criminal negligence:

> It is true in such cases allowance must be made for misadventure or accident, as distinguished from culpable negligence; and that, to support a conviction of crime, the accused must have been guilty of a higher and grosser degree of negligence than that which merely suffices to support a judgment in a civil case.

> To convict a motorist of homicide by negligence, it is, of course, not enough to prove that he was guilty merely of a want of due care, inadvertence, or inattention, but it must be shown that his negligence in driving was such that he knew or reasonably should have known that it might endanger human life, and that the death charged was the natural and probable result of such negligence.

<u>Roe v. State</u>, 358 S.W.2d 308, 314 (Tenn. 1962) (citations omitted); <u>see also</u> <u>Newby v. State</u>, 388 S.W.2d 136 (Tenn. 1965); <u>Potter v. State</u>, 124 S.W.2d 232 (Tenn. 1939); <u>State v. Norris</u>, 874 S.W.2d 590 (Tenn. Crim. App. 1993); <u>State v. Timothy Gose</u>, No. 03C01-9406-CR-00244 (Tenn. Crim. App., at Knoxville, Jan. 29, 1996).

The defendant makes a compelling argument. While the defendant may not have intended the disastrous results of the collision, intent is not required to sustain a finding of either recklessness or criminal negligence. In the numerous cases in which automobile accidents have lead to convictions for either criminally negligent or reckless homicide, the unifying strand is that the risk is of such a nature and degree that injury or death is likely and foreseeable.

In <u>State v. William Terry Martin</u>, No. 01C01-9602-CC-00067 (Tenn. Crim. App., at Nashville, Jan. 31, 1997), the defendant was convicted of vehicular homicide, a Class C felony defined as a reckless killing by the operation of an automobile. <u>See</u> Tenn. Code Ann. § 39-13-213(a)(1). In <u>Martin</u>, the proof established that the defendant had drifted into the lane of on-coming traffic several times. A witness saw the defendant's "head drop to the side of the headrest and snap back several times." <u>Martin</u>, slip op. at 8. The defendant eventually drifted over the center line and collided with an on-coming car, causing the death of the driver of the other car. Our court found sufficient evidence:

> Continuing to operate his vehicle on a two-lane highway, at dusk, after losing control several times suggests that the Defendant was aware of, yet disregarded the risks of his conduct. ... 'The test appears to be whether or not the driver, violating the highway statute ... does so consciously, or under circumstances which would charge a reasonable prudent person <u>with appreciation of the fact and the anticipation of consequences injurious or fatal to others</u>.'

<u>Id.</u>, slip op. at 9 (quoting <u>Trentham v. State</u>, 206 S.W.2d 291, 292 (Tenn. 1947)

11

(emphasis added)).

In State v. Ramsey, the defendant was convicted of criminally negligent homicide. The proof presented at trial showed that the defendant was driving at an excessive speed[2] on a familiar road when his car veered slightly into the lane of oncoming traffic. The defendant's car was driven back into its correct lane when "the centrifugal force of the defendant's car entering a right turn and its speed caused it to enter the opposite lane of traffic again, ... hitting a ... pick-up truck." Id., 903 S.W.2d at 711. Our court found the evidence sufficient: "[t]here is no other conclusion but that the defendant was aware of the substantial and [un]justifiable risk that an accident could ensue from driving fast and carelessly on a hilly, curvy road and that he consciously disregarded that risk by driving in such a manner." Id. at 712. The court found there was a "substantial and [un]justifiable risk" that injury would ensue.

In Reed v. State, 110 S.W.2d 308 (Tenn. 1937), also involving a head-on collision, the court found the evidence sufficient to support a conviction for involuntary manslaughter:

> In the case before us, in view of the traffic on this highway, this collision was not only a probable result but almost an inevitable result of such negligence as the defendant's. Likewise we think the act of defendant in undertaking to pass this truck, turning out to his left in heavy and closely approaching opposing traffic, was an act malum in se. It was an act on par with firing a gun into a crowded street, or dropping a heavy object into such a street from a tall building.

Reed, 110 S.W.2d at 308-09 (emphasis added). The graphic language of the Reed case expresses the essence of the cases where a car wreck has supported a

---

[2]The speed limit was thirty-five miles per hour. Witnesses speculated the defendant had been driving anywhere from fifty to eighty miles per hour. The parties simply stipulated the defendant was speeding. Ramsey, 903 S.W.2d at 712.

12

homicide conviction: the risk must be of such a nature and degree that injury or death is very likely. This type of language is used repeatedly in the cases finding the evidence sufficient. Our supreme court reiterated the rule: "[I]t must be shown that his negligence in driving was such that he knew or reasonably should have known that it might endanger human life, and that the death charged was the natural and probable result of such negligence." State v. Johnson, 541 S.W.2d 417, 419 (Tenn. 1976) (quoting Roe v. State, 358 S.W.2d 308, 314 (Tenn. 1962) (emphasis added)). See also Crawley v. State, 413 S.W.2d 370 (Tenn. 1967); Newby v. State, 388 S.W.2d 136 (Tenn. 1965).

The defendant has relied on the holding in State v. Timothy Gose, No. 03C01-9406-CR-00244 (Tenn. Crim. App., at Knoxville, Jan. 29, 1996), a case in which the court found the evidence insufficient to support a conviction for vehicular homicide. The defendant-driver asked his passenger "to check out the passing gear." The defendant suddenly pressed the gas pedal causing the passing gear to engage. The vehicle accelerated and the right wheels veered off the road. When the defendant tried to correct the direction of the vehicle, his brakes locked, the vehicle fishtailed and, despite the defendant's efforts, slid sideways into a dump truck traveling in the opposite direction. The defendant, who was traveling between 45 and 53 miles per hour in a 40 miles per hour zone, explained that he was distracted only momentarily when his passenger dropped a cigarette to the floor of the vehicle.

Our court found the evidence insufficient because, "in the light most favorable to the State ..., the conduct of Gose does not constitute a gross deviation from the standard of care .... The mainstay of the state's case was speed.... While this exceeded the posted speed, it did not, standing alone, constitute gross

13

negligence or recklessness. Rather, it constituted a want of due care, inadvertence, and inattention." Gose, slip op. at 3 (internal quotation marks omitted). In Gose, it was deemed unforeseeable that traveling slightly over the speed limit would result in the death of the driver of the approaching dump truck. There was a "want of due care," but the risk of death was not a probable or likely consequence.

State v. Clarence Cunningham, No. 01C01-9309-CC-00291 (Tenn. Crim. App., at Nashville, July 14, 1995), is another case where our court found the evidence insufficient. In Cunningham, the defendant was convicted of criminally negligent homicide when a passenger in his truck "inexplicably" leapt from the defendant's moving vehicle, suffered head injuries, and died. There was testimony that the victim stated she wanted to exit the vehicle immediately before she leapt out the passenger side window. Our court found the evidence insufficient:

> [The] defendant [did not] anticipate[] that the victim would jump from the moving vehicle. ... It is not sufficient to say, with perfect hindsight, that the defendant should have known that the victim would jump from his vehicle. To affirm this conviction we must ... find that [the defendant] failed to perceive that his conduct presented an unjustifiable risk to the victim. Furthermore, the failure to perceive the risk must have been a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. We cannot find such a failure in this case.

Cunningham, slip op. at 4-5. In Cunningham, it was not foreseeable that the victim would jump from the moving vehicle; the victim's actions were described as "inexplicabl[e]." Id., slip op. at 3. Thus, there was insufficient evidence to support the defendant's conviction.

In Crawley v. State, 413 S.W.2d 370 (Tenn. 1967), the evidence was found to be insufficient when the defendant's vehicle struck the rear end of a second vehicle, which was parked partially on a highway, and then struck the victim, who

14

was standing beside the vehicle. The accident occurred at night. Observing that the state needed to offer proof that "the death charged was the natural and probable result of such negligence," the court found the evidence insufficient to support a conviction for involuntary manslaughter. Id. at 373 (quoting with approval Roe, 358 S.W.2d at 295). Again, the death of the victim was not deemed to be predictable in these circumstances.

Thus, this court must conclude that when one disregards a stop sign and enters a four-lane, divided highway, and, without slowing down, crosses through a median connector, the risk of injury is surely "substantial and unjustifiable." We conclude there is sufficient evidence to support all three convictions.

We must now determine the appropriate remedy. Both parties have filed supplemental briefs addressing the thirteenth juror rule and the appropriate procedure to follow when a conviction is subsequently reinstated by the appellate court. Rule 33(f), Tenn. R. Crim. P., provides, in part, as follows: "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." In interpreting Rule 33(f), our supreme court has held as follows:

> Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment.

State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995) (emphasis added). "The purpose of the thirteenth juror rule is to be a 'safeguard ... against a miscarriage of justice by the jury.'" State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995) (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)).

15

In Carter, our supreme court established the standards for determining whether the trial judge has performed his role as thirteenth juror:

> [N]o explicit statement on the record is required by the trial judge that the duty has been performed. Accordingly, where a motion for new trial is denied without a statement, an appellate court may presume that the trial judge approved the jury's verdict as the thirteenth juror.

896 S.W.2d at 120.

The state argues the trial judge has already performed his role as thirteenth juror and accredited the jury's verdict; therefore, no remand is needed and the jury's verdict and the defendant's sentence should be reinstated. The defendant contends that when the trial judge granted an acquittal, he rejected the jury's verdict; therefore, the remedy must be a new trial. In our view, however, the trial judge has not yet exercised his responsibility as a thirteenth juror.

Had the trial judge entered judgment and then denied the motion for new trial, our inference would be that he acted as thirteenth juror. See Carter, 896 S.W.2d at 122. Yet, in this instance, the defense motion for new trial, which included an allegation that the verdict was not supported by the weight of the evidence, was not addressed. The acquittal rendered the issue moot.

We also reject the notion that the trial judge has implicitly fulfilled his duties as thirteenth juror. This court rejected a similar argument in State v. Dankworth:

> There are important distinctions between the setting aside of a verdict under Rule 33(f) and a judgment of acquittal under Rule 29 of the Tennessee Rules of Criminal Procedure. To resolve a motion for a judgment of acquittal under Rule 29, the trial court must examine the sufficiency of the evidence. In determining the sufficiency, a court considers the evidence presented

16

at trial in the light most favorable to the prosecution and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The court does not reweigh or reevaluate the evidence. Nor does a court substitute its inferences for those drawn by the trier of fact from the evidence. If the trial judge determines that the evidence is insufficient to support a jury's guilty verdict beyond a reasonable doubt, a judgment of acquittal is granted. The state may not retry the defendant but has the right of appeal.

Rule 33(f) requires the trial judge to independently weigh the evidence and assess the witness' credibility. The trial judge must be personally satisfied with the verdict.

Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995) (citations omitted).

In State v. Adams, 916 S.W.2d 471, 477 (Tenn. Crim. App. 1995), this court reversed the trial judge's grant of a judgment of acquittal, remanded for a ruling on all issues raised in the motion for new trial, and then consideration of the evidence as thirteenth juror:

[T]he record reflects that the trial court did not rule upon the merits of these issues. Thus, it would be unfair to the appellee to finalize this lawsuit without giving the appellee and the state the opportunity to argue the merits of the issues raised in the motion for a new trial, and having the trial court resolve these issues.

Adams, 916 S.W.2d at 477.

In Moats, our supreme court ruled that "an appellate court must grant a new trial when the record contains statements by the trial court expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court misunderstood its responsibility or authority to act as the thirteenth juror." Moats, 906 S.W.2d at 435-36. The court declined to remand the case for the trial judge to perform its role as thirteenth juror, primarily because "[t]he more time that passes between the trial and the trial court's evaluation of the evidence as the thirteenth juror, the less meaningful the 'safeguard'

becomes." Id. at 435.  The supreme court was concerned that the trial judge would be hindered in exercising its responsibility because of the passage of time.  Id. at 434-35.

In Moats, our supreme court implied that a thirteenth juror determination after a remand may not always "insure that the purpose and protection of the thirteenth juror rule" is protected.  Id. at 435.  However, the trial judge, after being asked to fulfill its role as thirteenth juror, merely deferred to the jury verdict:  "I don't feel it is appropriate for me to overturn that jury's conclusion...."  Id. at 433.  The circumstances here are almost identical to those in Adams, where the thirteenth juror function had been pre-empted by the entry of a judgment of acquittal.

In a recent case, State v. Ronnie W. Nail, No. 03C01-9406-CR-00197 (Tenn. Crim. App., at Knoxville, May 19, 1997), the trial judge had been defeated in his re-election effort before he was able to rule on a motion for new trial; his successor denied the motion for new trial.  On appeal, this court, while acknowledging that the successor judge could exercise thirteenth juror responsibility, granted a new trial on the basis that the successor judge could not fulfill the role of thirteenth juror in that case because there was no record of the trial available for review:

> [T]he successor judge would need to determine the
> extent to which witness credibility was a factor in the
> case and the extent to which he had sufficient knowledge
> or records before it in order to decide whether the
> credible evidence, as viewed by the judge, adequately
> supported the verdict.  If these determinations could not
> be made by the successor judge, the verdict could not be
> approved and a new trial should have been granted.

Nail, slip op. at 7 (citations omitted).  In State v. Bilbrey, 858 S.W.2d 911 (Tenn. Crim. App. 1993), this court ruled that a successor to the trial judge who began the proceeding could, if sufficiently familiar with the record, preside until the conclusion

18

of the case. Implicit in the Nail ruling is that a judge whose first exposure to the case was presiding over the motion for new trial could rule on the motion if the record was available so long as witness credibility was not an overriding issue. Only eighteen months have passed since the trial of this case. The entire record, including the arguments of counsel and the ruling on the motion for judgment of acquittal, is available for the trial judge to review, if necessary, to refresh his memory. In our view, the more practical remedy is for the trial judge to be given the opportunity for exercising his duties under the thirteenth juror rule, and consider all grounds in the motion for new trial.

For these reasons, we remand this case to the trial court to act as thirteenth juror, to rule upon the motion for new trial, and to consider sentencing alternatives if appropriate.[3]

_____
Gary R. Wade, Judge

CONCUR:

_____
Joe B. Jones, Presiding Judge

_____
Curwood Witt, Judge

---

[3]While there is a reference to the Corrections Management Corporation for a recommendation on alternative sentencing, the trial court never ruled on the appropriateness of an alternative sentence.