# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 24, 2010 Session

## STATE OF TENNESSEE v. DOMONTE O. BRIGGS

**Appeal from the Criminal Court for Sullivan County**
**No. S52,273     R. Jerry Beck, Judge**

---

**No. E2009-02397-CCA-R3-CD - Filed November 8, 2010**

---

A Sullivan County Criminal Court jury convicted the defendant, Domonte O. Briggs, of criminally negligent homicide, a Class E felony, and the trial court imposed a Range I sentence of two years' incarceration to be served consecutively to previously imposed sentences from North Carolina. On appeal, the defendant contends that the evidence is insufficient to support his conviction. Following our review, we agree. Accordingly, the judgment of the trial court is reversed, and the case is dismissed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed; Case Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

R. Wayne Culbertson, Kingsport, Tennessee, for the appellant, Domonte O. Briggs.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; H. Greeley Wells, District Attorney General; James F. Goodwin and Teresa Ann Nelson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Sullivan County grand jury charged the defendant, by presentment, with one count of vehicular homicide, *see* T.C.A. § 39-13-213(a)(1), for his involvement in the July 28, 2005 automobile accident on Interstate 81 that killed the victim, Kenneth J. Fontenot.

On the afternoon of July 28, 2005, Jack Bishop and his grandson were in the back bedroom of Mr. Bishop's home playing on the computer when they "heard a thud" coming from the direction of nearby Interstate 81 (I-81). They both ran to the front of the

house, looked out the front door, and saw "a big fire" on the interstate. Mr. Bishop directed his wife to get their camera to take photographs of the scene. Three photographs were admitted into evidence that showed the accident scene at various stages – when the accident first occurred, about thirty minutes later, and somewhat later after the fire had "burned out." Mr. Bishop walked to the scene with a cooler of ice and a sheet for the victim to lie on.

Stephen Edward Houchins, Sr., was traveling southbound on I-81 on the afternoon of July 28, 2005. He recalled that as he approached the 65-mile marker he heard "a whole bunch of yelling and hollering and cussing back and forth to drivers" on his Citizens' Band radio (CB). When he looked ahead, he noticed "cars swerving to miss a truck that was going very slow[ly]." Mr. Houchins had to move to the left lane to avoid hitting the truck. He noticed that one of the left trailer tires of the truck had "blown." He said that he called the driver, later identified as the defendant, on his CB to advise him to move to the shoulder. The driver told Mr. Houchins that he was afraid his truck would "turn over" on the shoulder. Mr. Houchins reassured the driver that the shoulder was safe. As he passed the slow truck, the driver moved to the shoulder. Mr. Houchins did not see the accident occur, but he learned about it later that day on his return trip through Bristol. Mr. Houchins was unable to "positively say for sure" whether he saw the flashers engaged on the defendant's truck.

Donald Ray Kelly, a truck driver of 33 years' experience, was traveling southbound on I-81 when he noticed a vehicle in front of him make a sudden move as a tractor-trailer moved from the right shoulder into the lane of traffic. He recalled that the tractor-trailer had blown a left tire on its trailer, causing damage to the left-side flasher. Mr. Kelly said that the right-side flasher was working. The tractor-trailer was moving slowly and was partially on the shoulder as Mr. Kelly passed safely. He learned of the accident a week later. Mr. Kelly testified that, as a tractor-trailer driver, it is "always prudent" and courteous to move to the left lane when a vehicle is on the shoulder.

Danny Allen Martin was traveling southbound on I-81 on the afternoon of July 28, 2005, when he noticed a tractor-trailer ahead of him in the emergency lane and perhaps partially in the right lane. Mr. Martin moved to the left lane and stayed back in case the tractor-trailer pulled in front of another truck nearby. He said, "[The] next thing I know, [the victim's] truck . . . was jack-knifed and [had] both lanes crossed. I had no place to go. . . [and I] c[a]me to a stop resting underneath [the victim's] trailer." Although photographs showed that Mr. Martin's vehicle was destroyed in the accident, Mr. Martin walked away from the scene uninjured.

Harold Lee Davis, a truck driver since 1977, was traveling northbound on I-81 on the afternoon of July 28, 2005. Somewhere near mile marker 65, he saw a southbound

tractor-trailer run into the median followed by "a big ball of fire." Mr. Davis immediately pulled over onto the shoulder and ran across the median to help. He and two motorcyclists arrived at the victim's burning truck to find the victim disoriented. They directed the victim from the burning tractor-trailer, extinguished the fire from the victim's torso, and walked him to a safer location away from the accident scene.

Andrew Joseph Long was traveling northbound on I-81 on his motorcycle when he suddenly saw an "extremely large fireball" in the southbound lane. He and his riding companion parked their motorcycles and ran to assist the victim from the burning tractor-trailer. Mr. Long used his jacket to extinguish flames from the victim's upper legs and abdomen. He moved the victim from the scene where he remained with the victim until emergency personnel arrived.

Robert Dale Farmer, a crash investigator with the Kingsport Police Department, testified as an expert in accident reconstruction. As a member of the Fatal Incident Reconstruction and Support Team (FIRST), he was notified of the accident at approximately 2:10 p.m. As he approached the scene at 2:30 p.m., he saw black smoke. Five or six hours passed as the fire department cleared the scene to allow the investigators to begin. Officer Farmer and the investigators walked through the scene, collected evidence, and took measurements of the roadway and debris in an effort to determine how the accident had occurred. Investigators observed tire marks on the roadway left by the victim's braking vehicle. They also observed gouge marks, deeper marks in the surface of the roadway, caused by the vehicles upon impact with one another.

The investigators determined that three vehicles were involved in the accident: the defendant's 1993 International tractor-trailer, the victim's 2005 Freightliner tractor-trailer, and Mr. Martin's Chevrolet pick-up truck. Officer Farmer concluded that the victim was traveling at a "normal rate of speed" – about 70 miles per hour – when the defendant moved into the right lane of traffic from the shoulder. The victim took "some type of evasive action" into the left lane, causing his tractor-trailer to jack-knife. The defendant's vehicle suffered damage to the left rear corner of the trailer. The victim's vehicle was completely destroyed. Officer Farmer deemed the incident a "collision," explaining that it could have been prevented.

On cross-examination, Officer Farmer said that the defendant was "mannerly and cooperative" at the scene. He said that neither alcohol, drugs, nor fatigue were thought to be contributing factors to the accident. He acknowledged that the weather conditions that day were clear and that there was moderate traffic. He agreed that visibility from "the top of the knoll" leading down the interstate was good that day, reaching a distance of approximately 1,700 feet. Officer Farmer also noted that the victim was transporting a

flammable substance in his trailer. He acknowledged that there was no way to tell where the victim was when the defendant pulled into the roadway and inattention, or "failure to keep a proper lookout," may have been the cause of an accident. Ultimately, he determined the cause to be the defendant's "failure to yield by encroaching into the traffic lane."

The parties stipulated that the victim died as a result of "severe thermal injuries" sustained in the accident.

The defendant contends that the evidence is insufficient to support his conviction of criminally negligent homicide. He argues that the proof failed to establish that death or injury was likely or foreseeable from his actions. In support of this argument, he notes that neither himself nor Mr. Martin suffered any injuries and that he had no knowledge that the victim was transporting flammable materials. With these considerations in mind, he contends that his actions did not constitute "a gross deviation from the standard of care that an ordinary person would exercise," thereby precluding a conviction of criminally negligent homicide. The State contends that the evidence sufficiently established the requisite elements of criminally negligent homicide.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 324 (1979); *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters,* 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters,* 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

To establish criminally negligent homicide, the State must prove three elements beyond a reasonable doubt: (1) criminally negligent conduct on the part of the accused; (2) that proximately causes; (3) a person's death. *See State v. Jones,* 151 S.W.3d 494, 499 (Tenn. 2004); *State v. Farner,* 66 S.W.3d 188, 199 (Tenn. 2001) (citing T.C.A. § 39-13-212(a) (defining criminally negligent homicide as "[c]riminally negligent conduct which

-4-

results in death")). A person "acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-106(a)(4) (2006). "The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]" *Id.*

To be criminally negligent, a defendant must fail to perceive a substantial and unjustifiable risk. *See State v. Roger Hostetler*, No. 02C01-9707-CC-00294, slip op. at 11 (Tenn. Crim. App., Jackson, Mar. 27, 1998); *see also State v. Owens*, 820 S.W.2d 757, 760 (Tenn. Crim. App.1991). Whether a defendant failed to perceive the risk must be determined under the circumstances as viewed from the defendant's standpoint. T.C.A. § 39-11-106(a)(4) (2006); *see also State v. Slater,* 841 S.W.2d 841, 842 (Tenn. Crim. App. 1992) (stating that the criminally negligent homicide statute "views the situation through the eyes of the [defendant] and whether he could have perceived and then chosen to ignore a 'substantial and unjustifiable risk'"). Even so, we do not regard the accused person's standpoint as "inject[ing] a totally subjective element into the analysis, such that the defendant is exonerated if he acted in good faith or, in fact, just failed to discern the risk." *Roger Hostetler,* slip op. at 12 n.3. The defendant's failure to perceive the risk must be a "gross deviation from the standard of care." T.C.A. § 39-11-106(a)(4) (2003).

This court has found sufficient evidence of criminally negligent homicide in situations involving the operation of a motor vehicle. *See, e.g., State v. Gillon*, 15 S.W.3d 492, 498 (Tenn. Crim. App.1997) (criminally negligent homicide evidence sufficient where defendant, without stopping at a stop sign of which he was aware, drove swiftly from a two-lane road across a four-lane highway and collided with car traveling on the four-lane). In *State v. Timothy Gose*, No. 03C01-9406-CR-00244 (Tenn. Crim. App., Knoxville, Jan. 29, 1996), this court indicated that exceeding the posted speed limit did not alone constitute gross negligence or recklessness but rather "a want of due care, inadvertence, or inattention." *Id.*, slip op. at 3. In *Roe v. State*, 358 S.W.2d 308 (Tenn. 1962), our supreme court said that to establish homicide via negligent operation of an automobile, the proof must show more than a "mere[ ] want of due care, inadvertence, or inattention," and the defendant must have known "or reasonably should have known that . . . the death charged was the natural and probable consequence of such negligence." *Id.* at 314.

The exercise of "due care" denotes the standard for determining civil tort liability based upon negligence. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Something more than a failure to exercise due or reasonable care is required to elevate tortious carelessness to the level of criminal conduct. T.C.A. § 39-11-302(d) (2006),

Advisory Comm'n Comments. In cases of criminally negligent conduct, that "something more" is the requirement that the negligence must be a "gross deviation" from the standard of duty of reasonable care. *Hostetler*, slip op. at 11-12. For example, in *State v. Willard Hart*, No. 02C01-9809-CC-00271 (Tenn. Crim. App., Jackson, June 25, 1999), this court concluded that "the jury could have reasonably [found] that the defendant's failure to perceive the risk of driving after consuming alcohol constituted a gross deviation from the standard of care, resulting in the death of [the victim]." *Id.*, slip op. at 11.

Turning to the facts of this case and indulging every legitimate view of the evidence in favor of the State, the proof in this case showed that the defendant was traveling at a slow rate of speed both on the shoulder and in the right traffic lane of the interstate due to a blown tire on his trailer. Witnesses said that visibility was good that day. Several witnesses stated that they could see other vehicles taking evasive action to move around the defendant safely. Indeed, these witnesses were able to travel safely past the defendant. One witness testified affirmatively that he saw the right hazard flasher of the truck as he approached the defendant's truck.

Officer Farmer testified that the sight distance from "the knoll" at the top of the interstate traveling southbound, where the victim could have first seen the defendant's tractor-trailer, was 1,700 feet. He determined the cause of the accident to be the defendant's failure to yield; however, he also acknowledged that the victim's inattention, or "failure to keep a proper lookout," could have contributed to the accident. Likewise, Officer Farmer testified that it was impossible to determine the location of the victim's tractor-trailer when the defendant pulled onto the roadway. The defendant was "cooperative and mannerly at the accident scene," and there was no indication that either alcohol, drugs, or fatigue contributed to the accident.

Under these circumstances, we cannot conclude that the defendant's failure to perceive the risk of driving at a slow rate of speed with his hazard flashers activated constituted a "gross deviation from the standard of care." Therefore, we hold that the evidence is insufficient to support the conviction for criminally negligent homicide. The judgment of the trial court is reversed, and the case is dismissed.

_____
JAMES CURWOOD WITT, JR., JUDGE