IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2016 Session

**STATE OF TENNESSEE v. ROGER DALE STEWART**

**Appeal from the Criminal Court for Hawkins County**
**No. 13CR81     John F. Dugger, Jr., Judge**

_____

**No. E2015-00820-CCA-R3-CD – Filed October 18, 2016**

_____

The defendant, Roger Dale Stewart, was convicted of one count of criminally negligent homicide, a Class E felony, and two counts of reckless endangerment, Class E felonies. On appeal, he argues that the evidence was insufficient to sustain his convictions; that the trial court erred when it refused to provide a requested jury instruction; that his convictions violate the principles of double jeopardy and the Due Process Clause; and that the trial court erred by imposing a two-year sentence to be served in confinement. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which TIMOTHY L. EASTER, J., joined. NORMA MCGEE OGLE, J., filed a separate opinion concurring in part and dissenting in part.

William E. Phillips and William E. Phillips, II, Rogersville, Tennessee, for the Appellant, Roger Dale Stewart.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Dan Armstrong, District Attorney General; and Lindsey Lane, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

This case arose after a fatal car wreck. At trial, the State's theory was that the defendant was driving the wrong way into oncoming traffic in the slow lane of the highway in an attempt to reach the automobile dealership where he worked.

Mr. Jerry Hughes testified that on the date of the wreck, his family had a birthday lunch for his mother, Ms. Thelma Hughes. After they left the restaurant, Mr. Hughes was driving his mother's car, a 1990 Plymouth. Mr. Hughes's mother and nephew were also in the car. Mr. Hughes was driving on Highway 11W, and he was traveling at fifty to fifty-five miles per hour in the right hand lane. As he was driving, he saw a car driven by the defendant "coming right at" him going south[1] in a northbound lane "kind of down the wrong side of the four-lane." He did not see the defendant until the defendant "was turning down the four-lane in the wrong lane." Mr. Hughes attempted to turn the steering wheel to avoid a collision, but the defendant hit the driver's front end and driver's side of Mr. Hughes's car, sending it into a grassy area beside the road. Mr. Hughes testified that the collision occurred at an angle. After the wreck, Mr. Hughes saw his mother "slumped over" in the front passenger's seat. He asked if she was alright, and Ms. Hughes replied, "[N]o." Ms. Hughes was having difficulty breathing, and Mr. Hughes held her head up in an effort to alleviate her struggles until the rescue crew arrived. Mr. Hughes testified that his hand was swollen and that he temporarily lost some usage of it but that it was "okay now that way." Mr. Hughes testified that his nephew suffered a slight burn on his neck from the seat belt.

After the accident, Ms. Hughes was transported to the hospital, where according to Mr. Hughes, "[s]he was in a lot of pain." She passed away almost six weeks after the wreck. Mr. Hughes described Ms. Hughes's condition as "horrifying," as she seemed like she was in constant pain. Mr. Hughes stated that Ms. Hughes had a broken left wrist and a broken right thumb, which rendered her unable to use either hand. She had to wear a neck brace "and a full body brace to the waist" as a result of her broken bones.

Dr. Dan Anderson testified that he worked at Holston Valley Medical Center as a trauma and surgical critical care physician. He treated Ms. Hughes, and he said that she had a high neck fracture, bilateral rib fractures, a sternal fracture, a fracture in her L3 lumbar vertebral body, a left wrist fracture, and right hand fractures. He testified that her condition was worsened by a previous history of atrial fibrillation. Ms. Hughes took blood thinning medication to treat the condition, and Dr. Anderson explained that she was mildly coagulopathic, which worsened her outcome. Dr. Anderson testified that the eighty-four-year-old Ms. Hughes likely had at least eight fractured ribs, and he stated that the mortality risk for a person over the age of seventy with those injuries was between

---

[1] While Mr. Hughes identified the direction of Highway 11W as "North" and "South," it appears that the highway runs eastbound and westbound.

2

sixty and eighty percent. He testified that a primary concern for elderly patients who had to wear cervical collars and back braces was their ability to eat. He explained that the most common problem was aspiration, which would cause a buildup in the lungs and lead to pneumonia. He estimated that Ms. Hughes "would at best have a 50 percent chance of leaving the hospital at any point."

Dr. Dawn LaJoie performed an autopsy of Ms. Hughes. She testified that "Ms. Hughes died of complications of multiple blunt force injuries." She explained that Ms. Hughes had bilateral pneumonia. Dr. LaJoie agreed that Ms. Hughes had more than twice the amount of the average level of morphine in her system. Dr. LaJoie explained that these "supratherapeutic" levels of morphine in her system were not uncommon for cases of chronic pain management and comfort care measures.

Sergeant Scott Alley of the Hawkins County Sheriff's Department responded to the crash scene. He testified that he observed a Ford Fusion, driven by the defendant, and a gray Plymouth, driven by Mr. Hughes, both with "heavy front-end damage." The majority of damage to the defendant's vehicle was on the corner of the front passenger's side, and the Hughes's vehicle was primarily damaged on the corner of the front driver's side. Both vehicles were facing an eastbound direction. Sergeant Alley first spoke with the defendant, and he said that the defendant did not appear disoriented, but he agreed that during a deposition he said that the defendant "seemed a little addled." Sergeant Alley also spoke with Ms. Hughes, who told him that she was "'hurting all over.'" Sergeant Alley initially believed that there were only two people in the Hughes's vehicle, but he learned several days after the accident that there was a third person in the vehicle.

Based on statements from the defendant and "skid marks and gouge marks" from the Hughes's vehicle, Sergeant Alley created a diagram of the crash, which occurred in the eastbound lane of Highway 11W. The defendant told Sergeant Alley that he was test-driving the vehicle and attempting to return it to R&R Auto Sales, which was located just off of Highway 11W. The defendant told Sergeant Alley "that he was trying to cross over to go down the shoulder of the roadway to get to R&R Auto Sales, which put him traveling west in the eastbound lanes of 11W." The highway had two westbound lanes and two eastbound lanes separated by medians. Between some of the medians were "crossovers," which were streets that permitted someone driving west to turn left and cross the eastbound lanes. Based on his investigation of the scene, Sergeant Alley determined that just before the crash, the defendant was traveling west on Highway 11W. When he reached the Corbin Heights Road crossover, he turned left and then bore right onto Highway 11W, intentionally traveling west into oncoming eastbound traffic. The Hughes's vehicle was traveling eastbound on Highway 11W in the right hand lane when the collision occurred, and Sergeant Alley testified that it was a "head on" collision.

Sergeant Alley agreed that his diagram showed an approximation of the defendant's route but "not the exact route" that the defendant traveled.

Based on a skid mark from the Hughes's vehicle, Sergeant Alley was able to determine the point of impact of the crash. Sergeant Alley testified that "[t]he approximate point of impact was in the eastbound right-hand or slow lane, probably a couple of feet into the lane from the white line shoulder." Sergeant Alley testified that the impact occurred at an angle of "thirtyish" degrees between the front passenger's side of the defendant's car and the front driver's side of the Hughes's vehicle. He explained that while the vehicles were at an angle and did not collide directly head-on, "it was a head-on collision, front end of the vehicle to the front end of the vehicle." Sergeant Alley estimated that the point of impact occurred thirty to forty feet away from the intersection of Corbin Heights Road and Highway 11W, and he testified that it was not possible that the collision occurred in the intersection of Corbin Heights and Highway 11W.

Sergeant Alley testified that there were alternate ways to reach R&R Auto Sales. He explained that the defendant could have continued westbound and reached a crossover road several hundred yards further down Highway 11W. The defendant could have used this crossover road to then travel eastbound to R&R Auto Sales. At the hospital, the defendant told Sergeant Alley that he was attempting to cross over the highway to enter the parking lot of R&R Auto Sales via the shoulder of the eastbound lane of Highway 11W. He told Sergeant Alley that "it was something that he had done a thousand times before[,] and nothing like this had ever happened."

Sergeant Alley agreed that there were a number of vehicles for sale parked by R&R Auto Sales in a grassy area close to the collision site. An aerial surveillance photograph of the area revealed patches of dead grass close to the crash site and the intersection of Highway 11W and Corbin Heights Road, indicating that cars for sale had previously been parked there. Photographs taken the day of the crash showed that a minivan was parked in the grass close to the intersection between Highway 11W and Corbin Heights Drive, which is where the Hughes's car came to rest. Sergeant Alley agreed that it was "not impossible" that the defendant meant that he had been attempting to access the portion of the lot closest to the intersection when he said that he was crossing over to the lot. However, he testified that based on the point of impact, which was further west than the minivan, he did not believe that it was possible that the defendant was attempting to access this area of the lot when the crash occurred. He testified that it was possible that the defendant was attempting to access the lot west of the point of impact. Sergeant Alley testified that if the defendant was attempting to make a continuous left turn to access the parking spot next to the van, instead of turning right down Highway 11W, that he would have continued onto Corbin Heights Drive. He also testified that the impact would have occurred more on the passenger's side, rather than

4

the front, of the defendant's vehicle had he been driving the proposed route. He agreed that other than the defendant's statement, he did not have any evidence to support his conclusion that the defendant intentionally drove the wrong way down Highway 11W. He testified that he did not believe that the defendant was turning left the entire time after he entered the intersection, and he said that he would be surprised if data from the air bag module in the defendant's car indicated that he was turning left the whole time.

Sergeant Alley agreed that his depiction of the crash had the driver's side of the defendant's vehicle impacting the front driver's side of the Hughes's vehicle, and he agreed that the damage to the vehicles did not reflect a collision in this manner. He testified that the collision was a "head on" collision.

Trooper James Fillers of the Tennessee Highway Patrol testified that he was a member of the Critical Incident Response Team ("CIRT") and that he performed an accident reconstruction of the wreck. In creating the reconstruction, Trooper Fillers relied on data from the air bag control module on the defendant's car, Sergeant Alley's diagram, witness statements, and his own personal observations of the scene. Using a tool called "Total Station," he was able to take measurements of the roadway and tire marks. He visited the scene eight days after the crash and took photographs of the intersection from the westbound turn lane of Highway 11W. A "Do Not Enter" sign is visible in these photographs. Trooper Fillers testified that a tire mark made by the right passenger's side tire of the Hughes's vehicle reflected the point of impact. He identified photographs of scratches on the pavement just in front of the tire marks, which he testified were indicative of the Hughes's vehicle striking "a frame or a rim that would contact the pavement and cause that mark." Trooper Fillers testified that the accident occurred over fifty feet from the intersection of Highway 11W and Corbin Heights Road. He created damage profiles of both vehicles, and he testified that the damage was consistent with a head-on collision. Trooper Fillers reviewed Sergeant Alley's diagram of the accident when reconstructing the scene, and he testified that the only change that he would make to the diagram would be to align the rear end of the defendant's car closer to the shoulder line.

Trooper Fillers completed a CIRT report that included data from the air bag control module on the defendant's vehicle. The module contained "five seconds of pre-crash data," and Trooper Fillers analyzed the data for his report. Within the report, Trooper Fillers drafted a memorandum that included measurements of the defendant's vehicle's speed, engine revolutions per minute, and service brakes in the five seconds leading up to the crash. Trooper Fillers agreed that there was additional data in his report that he did not include in his memorandum, and he explained that he omitted the information because it would have been redundant. However, he testified that he considered the additional data, including the "Delta V data" that showed the change in

5

velocity of the defendant's vehicle, when making his analysis about the cause of the accident. The module showed that five seconds before impact, the defendant's speed was 28 miles per hour; half of a second before impact his speed was 18 miles per hour; and at impact the defendant was driving 14.9 miles per hour. The module also recorded the position of the steering wheel. Trooper Fillers explained that positive numbers meant that the wheel was being turned to the left, and negative numbers indicated a turn to the right. Five seconds before the crash, the wheel was at 4.9 degrees, which Trooper Fillers testified meant that the wheel was turned to the left. One and a half seconds before the crash, the wheel was at negative 1.7 degrees, indicating a "[r]ight-hand turn." Trooper Fillers testified that he did not attempt to estimate the speed of the Hughes's vehicle, but he testified that if the car were traveling fifty-five miles per hour at the point of impact, the force of the collision would have moved the defendant's car in the same direction that the Hughes's vehicle was traveling. He testified that the collision would have sent the defendant's car into "a counterclockwise rotation, rearward." After his investigation, Trooper Fillers concluded that "driving on the wrong side of the roadway is the primary contributing factor to the cause of this crash."

On cross-examination, Trooper Fillers agreed that the diagram created with Total Station did not represent any analysis or accident reconstruction but simply represented the measurements he took. He explained that his entire report constituted the accident reconstruction, and it was based upon the total evidence, witness statements, photographs, vehicle examinations, damage profile, and scale diagram[s]. He agreed that he did not include a diagram of the pre-impact or post-impact direction of the vehicles. He testified that he did not attempt to calculate the speed of the Hughes's car prior to the wreck. He also agreed that he did not attempt to calculate the directional force of impact, and he testified that such an analysis would not have answered any questions for him. He stated that he did not need to calculate the direction of force because he was able to conclude that the collision was a head-on collision based upon "a combination of roadway evidence, damage profiles, vehicle examinations, [and] witness statements." He stated that he was certain that his depiction of the crash was accurate. He explained that he could determine the alignment of the vehicles at the point of impact based upon the tire mark indicating the point of impact. He said that the damage profiles explained how the cars crashed into one another and that he was able to "match the damage up." He testified that it would surprise him if an analysis of the data in his report indicated a direction of collision force that was different from what he suggested. He testified that it was not possible that the defendant never turned right on Highway 11W because without the right turn, the defendant would have driven through a yard.

Mr. Ricky Stewart, Dr. Dan Carroll, and Mr. Scott Reiling testified for the defense. Mr. Stewart testified that he owned R&R Auto Sales and that the defendant was his brother. The defendant was an agent for R&R Auto Sales and had the authority to

6

purchase vehicles at auction on behalf of R&R Auto Sales. On the date of the accident, Mr. Stewart instructed the defendant to attempt to sell the Ford Fusion at an auction and to return the car to the R&R Auto Sales lot if he could not sell it. Mr. Stewart was shown a picture of the R&R Auto Sales lot, and he testified that he parked used automobiles for sale in the grassy area all the way to the edge of the intersection between Corbin Heights Road and Highway 11W. He testified that the defendant had parked vehicles in that location at Mr. Stewart's direction many times before.

Dr. Carroll testified that he had treated the defendant since 1995 and that the defendant suffered from diabetes. Nearly a month after the accident, the defendant came to see Dr. Carroll, and he said that just prior to the accident, while driving the vehicle, he experienced a "syncopal episode," which was accompanied by "a sense of impending faint, light-headedness and visual disturbance." Dr. Carroll explained that a syncopal event was "temporary loss of consciousness" followed by "spontaneous recovery." He stated that the event lasted only "a matter of minutes" and that it caused a loss of muscle tone, which could cause a person to slump over or to fall down. The defendant told Dr. Carroll that he had consumed several high sugar drinks prior to the accident, and Dr. Carroll testified that consuming a large quantity of sugar could lead to a syncopal episode. He testified that based on the information that the defendant provided, the defendant suffered from a syncopal episode. Dr. Carroll testified that another emergency room doctor, Dr. Ken Goh, arrived at the scene of the accident moments after it occurred and wrote that the defendant "seemed momentarily stunned and confused but cleared up fairly quickly." Dr. Goh also wrote that the defendant appeared "dazed."

On cross-examination, Dr. Carroll testified that the only evidence that the defendant suffered from a syncopal episode was the statements of the defendant and Dr. Goh. Dr. Carroll was not aware that the defendant was facing criminal charges when he examined him.

Mr. Reiling testified as an expert in accident reconstruction. He conducted an accident reconstruction, and he stated that his analysis in many respects matched the survey of Trooper Fillers. Based on photographs, Mr. Reiling identified what he said was a post-impact skid mark from the defendant's vehicle. He conducted a vehicle alignment test and determined where the vehicles were located at the point of impact. He testified that the vehicles collided at a sixty degree angle. He testified that the collision caused the defendant's car to rotate in a counterclockwise direction and that if the State's estimation of direction force was correct, the defendant's vehicle would have rotated in a clockwise motion. He testified that Trooper Fillers's estimation of the angle of the vehicles was incorrect because if they had collided in the manner proposed by Trooper Fillers, there would have been "contact damage across the entire front-end of the Ford and most of the front-end of the Plymouth." He testified that the photographs of the vehicles indicated

7

that the damage was "limited to corner-to-corner impact" and that the cars could not have physically collided in the manner proposed by Trooper Fillers.

Mr. Reiling testified that he did not see any analysis conducted on any data in the report other than the data that was included in Trooper Fillers's memorandum. He stated that he utilized the "Delta V" data to calculate the direction of the impact force as forty-one degrees. He testified that this data could be particularly valuable in accident reconstruction, particularly when there was "no roadway evidence." Mr. Reiling explained that he used other data in the CIRT report and that it was helpful in ascertaining the pre-impact path of the defendant's vehicle. Mr. Reiling testified that the defendant never turned to the right after leaving the intersection but that his vehicle continued "along a curved path." He stated that his analysis contradicted Sergeant Alley's diagram of the crash, which showed the defendant's vehicle turning right. He also stated that the steering wheel angles were not indicative of the movement of the entire vehicle. He testified that the slight change in direction of the steering wheel half of a second before the crash would not have been significant enough to change the direction of the vehicle. He stated that the left front corner of the defendant's vehicle had entered the shoulder of the road at the time of the collision. Mr. Reiling identified the "Do Not Enter" sign, and he said that there was no indication that the defendant's vehicle was in front of the sign at the time of impact.

At the conclusion of the proof, the jury convicted the defendant of criminally negligent homicide of Ms. Hughes as a lesser included offense of reckless vehicular homicide in Count 1 and of reckless endangerment of Mr. Hughes and his minor nephew with a deadly weapon as charged in Counts 2 and 3. The trial court ordered the preparation of a presentence report for the sentencing hearing.

At the sentencing hearing, the State argued that several enhancement factors applied. The State asked the trial court to consider the defendant's prior criminal history; that the offense involved more than one victim; that a victim of the offense was particularly vulnerable, citing to the fact that Ms. Hughes was eighty-four years old; that the injuries to the victims and damage to their property was particularly great; that the defendant used a deadly weapon during the commission of the offense; that the defendant had no hesitation about committing a crime when the risk to human life was high; and that during the commission of a felony the defendant's actions resulted in the death of another. The State contended that no mitigating factors were present.

The defendant called several witnesses to testify on his behalf. Kendall Lawson testified that he was a practicing attorney who had known the defendant for twenty to twenty-five years. He testified that, in his opinion, the defendant was a person of good character, and he testified that the defendant had been very helpful to the community. He

testified that the defendant had provided assistance to many in the community, including Mr. Lawson himself. He testified that he was aware that the defendant had filed for bankruptcy.

Jim Point testified that he was a practicing attorney and that he had known the defendant for about thirty-two years, although he stated that the nature of their relationship was primarily professional. Mr. Point testified that the defendant was a person of good character whose involvement in the community had been "excellent." He testified that the defendant had been very generous with donating his money and equipment to those in need. He stated that the defendant had a good relationship with his children and was making sure that his children were raised well.

Brad Price testified that he knew the defendant through his church. He testified that the defendant ensured that his children regularly attended church and that the defendant also attended church regularly. He testified that the defendant had good character and provided assistance to those in need in the community.

Lynn Mahan testified that he attended church with the defendant and had "the utmost respect for" him. He testified that he had observed the defendant provide a great deal of financial and spiritual assistance to members of the community.

The defendant testified and said that he was sorry for the wreck. He stated that he did not cry when he lost both of his parents in a car accident but that he had "shed a million tears over Ms. Hughes." The defendant testified that he completed the seventh or eighth grade but that he could not read very well. He explained that he had started a successful business that allowed him to make charitable contributions to the community. He stated that he and his wife purchased Christmas gifts for the children of fifteen strangers.

The defendant testified that he currently operated a business with four employees. He explained that he had to be present on a daily basis to oversee the operation of the business. He testified that his employees would lose their jobs if he was incarcerated. He testified that he had declared bankruptcy and owed a bank two million dollars. He testified that he needed to operate his business so that he could pay off his debts.

The defendant testified that he had two children and that he paid $150 a week in child support. He shared custody of the children. The defendant testified that he was in poor health, suffering from diabetes and tremendous pain in his legs and knees.

On cross-examination, the defendant agreed that he had received speeding tickets in the past, and he believed that he received a speeding ticket after the accident. He

testified that he had been in two other minor car wrecks since the accident. He stated that forty-seven years ago, he purchased stolen tools and received probation. He also admitted that twenty-five years ago, a police officer told him that he was arrested for a hit and run. He began arguing with the officer and eventually "swung at him." He stated that the trial cost him over $700,000.

The trial court found that several enhancement factors applied. The court found that the defendant had a previous history of criminal convictions, citing to the defendant's felony grand larceny conviction, numerous traffic offenses, and the assault conviction. *See* T.C.A. § 40-35-114(1). The court found that Ms. Hughes was particularly vulnerable due to her age, noting that a younger person with her injuries may have survived the crash. *See* T.C.A. § 40-35-114(4). The court found that the defendant possessed a deadly weapon during the offense, noting that the defendant used a vehicle in the commission of the offense and that there were "other ways for someone to die in criminally negligent homicide other than a vehicle." *See* T.C.A. § 40-35-114(9). The court found that no mitigating factors applied.

The trial court observed that "other people need to be deterred from this kind of behavior." The court stated that this was "a serious" and "tragic case," noting that Ms. Hughes was in the wreck on her birthday and passed away after suffering from extreme physical pain for weeks as a result "of the defendant's desire to take a shortcut across the road." The court noted that the defendant was not in good physical health and observed that the defendant had several witnesses who testified to the defendant's good character and the positive impact that he made in the community. However, the court gave "great weight to the facts and circumstances surrounding the offense and the nature of the circumstances of the defendant's criminal conduct."

The court found that to give the defendant probation on "this kind of case" would send "a terrible message" because "[a]n 84-year-old woman was killed, suffered greatly and to just send somebody home on probation and it's not right." The trial court stated that it observed the defendant during trial and that he never displayed remorse during the trial. The trial court said that the defendant "looked like somebody just trying to get out of the case. Trying to get out of trouble." The court stated that the defendant displayed remorse at the sentencing hearing when he was facing jail time. "But from what I saw, he just kept pouring glasses of water and drinking water during the trial and just acting like he was bored throughout the trial." The court found that the defendant had shown no remorse at trial for his actions. The court found that the defendant "probably would abide by probation" but that there was a chance that he would get into another car wreck or be charged with a traffic violation, observing that the defendant received a speeding ticket and was involved in two traffic accidents while this case was pending. In terms of protecting society from the defendant's future conduct, the court found that the defendant

was unlikely to commit "any major offenses." The court found that full probation would unduly depreciate the seriousness of the offense.

The trial court imposed a two-year sentence for the conviction for criminally negligent homicide. The court also merged the reckless endangerment conviction in Count 3 with the reckless endangerment conviction in Count 2, and it imposed a two-year sentence in Count 2.[2] The court sentenced the defendant as a Range I offender and ordered the sentences to be served concurrently, for an effective sentence of two years.

## ANALYSIS

The defendant argues that the evidence was insufficient to support his convictions; that the trial court erred when it denied the defendant's request for special jury instructions for the offenses of reckless vehicular homicide and criminally negligent homicide; that his conviction for felony reckless endangerment violates the Double Jeopardy and Due Process clauses of the United States and Tennessee Constitutions; and that the trial court abused its discretion in denying an alternative sentence and imposing the maximum sentence.

## I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his convictions. He contends that his actions were not a "gross deviation" from the standard of reasonable care. He also claims that the evidence does not support a finding that he knew or should have known that his actions might endanger human life. Finally, he contends that the State's evidence was not believable. The State responds that the evidence was sufficient.

---

[2] At the sentencing hearing, the State advised the trial court that the "[S]tate would stipulate that [the two separate counts of felony reckless endangerment] need to merge into one count." We do not agree that the counts needed to merge. In *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), a case reviewing a reckless endangerment conviction, the supreme court noted that when permitted by the facts, the State may pursue multiple offenses for each of the different individuals who were put in jeopardy by a defendant's conduct. *Id.* at 519 n.5. When the State elects to prosecute a defendant for criminal acts committed against individual victims, as alleged in Counts 2 and 3 of the defendant's indictment, as opposed to a class of persons, the State can have multiple indictments for reckless endangerment. *State v. Payne*, 7 S.W.3d 25, 29 n.3 (Tenn. 1999). If we were to apply a double jeopardy analysis under *State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012) (released contemporaneously with *Cross*), the defendant could have been convicted separately of both counts of reckless endangerment because each count involved a different named victim. Thus, separate convictions for Counts 2 and 3 fail the threshold scrutiny for a double jeopardy claim. *Id.* at 556-57. Any error by the trial court in accepting the State's stipulation, however, does not reach the level of plain error because our consideration of such is not necessary to do substantial justice. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "[A]lthough inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

In order "[t]o establish criminally negligent homicide, the State must prove three elements beyond a reasonable doubt: (1) criminally negligent conduct on the part of the accused; (2) that proximately causes; (3) a person's death." *State v. Jones*, 151 S.W.3d 494, 499 (Tenn. 2004) (citing *State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001) (citing T.C.A. § 39-13-212(a))). "Criminally negligent conduct that results in death constitutes criminally negligent homicide." T.C.A. § 39-13-212(a) (2010). A person is criminally negligent who:

> acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of

care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-106(a)(4); *see also* T.C.A. § 39-11-302(d).

In order "[t]o be criminally negligent, a defendant must fail to perceive a substantial and unjustifiable risk." *State v. Briggs*, 343 S.W.3d 106, 110 (Tenn. Crim. App. 2010). "Whether a defendant failed to perceive the risk must be determined under the circumstances as viewed from the defendant's standpoint." *Id.* To establish criminally negligent homicide in the context of a motor vehicle accident, "the proof must show more than a 'mere[] want of due care, inadvertence, or inattention,' and the defendant must have known 'or reasonably should have known that . . . the death charged was the natural and probable consequence of such negligence.'" *Id.* (quoting *Roe v. State*, 358 S.W.2d 308, 314 (Tenn. 1962)).

A person commits the offense of felony reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and uses a deadly weapon. T.C.A. § 39-13-103(a), (b)(2). A person:

acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint

T.C.A. § 39-11-106(a)(31).

Viewing the evidence in the light most favorable to the State, the defendant turned into a cross through road in the median between the eastbound and westbound lanes of Highway 11W. Despite a "Do Not Enter" sign, the defendant was driving west in an eastbound lane when he struck the Hughes's car. The defendant told Sergeant Alley that he had performed this maneuver "a thousand times before," indicating that he was familiar with the area and the signs. Sergeant Alley and Trooper Fillers testified that this accident occurred at least thirty to forty feet from the intersection between Highway 11W and Corbin Heights Road, and Mr. Reiling testified that the accident occurred beyond the sign. The evidence was sufficient for a rational trier of fact to find that the defendant should have been aware of the substantial and unjustifiable risk of ignoring a "Do Not Enter" sign and driving the wrong way into oncoming traffic, that his actions constituted

13

a "gross deviation" of the standard of due care, and that he reasonably should have known that his conduct might endanger human life. The evidence was further sufficient for the jury to find that Ms. Hughes's death was a natural and probable result of the defendant's negligence. *See State v. Gillon*, 15 S.W.3d 492, 500 (Tenn. Crim. App. 1997) (upholding conviction for criminally negligent homicide when the defendant disregarded a stop sign and entered a four-lane, divided highway and crossed through a median connector without slowing down).

The evidence was also sufficient to show that the defendant acted recklessly. As stated above, Sergeant Alley testified that the defendant told him that he had utilized the shortcut to R&R Auto Sales "a thousand times before," indicating that he was aware of the "Do Not Enter" sign. A rational trier of fact could have found that the defendant consciously disregarded the substantial and unjustifiable risk of ignoring the sign to drive into oncoming traffic and that this act was a gross deviation from the standard of care an ordinary person would exercise in the defendant's position. The evidence was sufficient for the jury to find that by ignoring the sign and driving in the improper lane, the defendant placed Mr. Hughes and Mr. Hughes's eleven-year-old nephew in imminent danger of death or bodily injury and that he did so while using his automobile, which is considered a deadly weapon. *State v. Wilson*, 211 S.W.3d 714, 719 (Tenn. 2007) (stating that an automobile is considered a deadly weapon under the reckless endangerment statute).

The jury considered the testimony of Sergeant Alley and Trooper Fillers, along with the testimony of Mr. Reiling. The jury's verdicts indicate that they credited the testimony of the State's witnesses, and this court will not disturb that finding on appeal. We conclude that the defendant is not entitled to any relief.

## II. Jury Instructions

The defendant argues that the trial court erred when it denied his request for a special jury instruction regarding the offenses of reckless vehicular homicide and criminally negligent homicide. He contends that his instruction would have helped clarify the definition of criminally negligent homicide for the jury. The State responds that the trial court properly instructed the jury.

Regarding the charges of reckless vehicular homicide and criminally negligent homicide, the defendant requested that the trial court provide the following instruction, which was derived from *State v. Briggs*, 343 S.W.3d 106, 110 (Tenn. Crim. App. 2010), and *Roe v. State*, 358 S.W.2d 308, 314 (Tenn. 1962):

14

To establish homicide via the reckless or negligent operation of an automobile, the proof must show more than a mere want of due care, inadvertence, or inattention, and the defendant must have known or reasonably should have known that the death charged was the natural and probable consequence of such conduct.

The trial court declined to provide the requested instruction and instructed the jury as follows:

Recklessly means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

. . .

Criminal negligence means that a person acts with criminal negligence when the person ought to be aware of a substantial and unjustifiable risk that the alleged victim will be killed. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The court also instructed the jury that:

Before you can convict the defendant, the State must show beyond a reasonable doubt that a person or class of person was in the zone of danger. The zone of danger is that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury.

A defendant is entitled to "a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "A charge 'is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Hodges*, 944 S.W.2d 346,

15

352 (Tenn. 1997)). When a trial court's instructions correctly, fully, and fairly set forth the applicable law, the trial court's refusal to give a requested special instruction does not amount to error. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

In *Roe*, the Tennessee Supreme Court held that "[t]o convict a motorist of homicide by negligence, it is, of course, not enough to prove that he was guilty merely of a want of due care, inadvertence, or inattention, but it must be shown that his negligence in driving was such that he k[ne]w or reasonably should have known that it might endanger human life, and that the death charged was the natural and probable result of such negligence." *Roe*, 358 S.W.2d at 314. We reiterated this standard more recently in *Briggs*, 343 S.W.3d at 110 (concluding that defendant's failure to perceive risk of driving slowly on the shoulder after a malfunction was legally insufficient to constitute negligent homicide). We have alternatively described this as "the requirement that death or injury be likely and foreseeable in [criminal] cases involving automobile accidents." *State v. Jones*, 151 S.W.3d 494, 502 (Tenn. 2004) (concluding that defendant was not criminally negligent for traveling by car with a toddler on her lap); *see State v. Gillon*, 15 S.W.3d 492, 498 (Tenn. Crim. App. 1997) ("In the numerous cases in which automobile accidents have led to convictions for either criminally negligent or reckless homicide, the unifying strand is that the risk is of such a nature and degree that injury or death is likely and foreseeable.").

The Defendant does not cite any cases that stand for the proposition that it is error not to include the language he requested, and we can find none. In *State v. McKinney*, the trial court instructed the jury that it was *unnecessary* that the death be the natural and probable result of the defendant's drunk driving. 605 S.W.2d 842, 847 (Tenn. Crim. App. 1980). We nevertheless upheld the conviction because the instructions also included language requiring the jury to find that the unlawful conduct was the proximate cause of the death. *Id.* While the Tennessee Supreme Court has required an instruction that the harm be the natural and probable consequence of the criminal act in cases involving criminal responsibility, *State v. Howard*, 30 S.W.3d 271 (Tenn. 2000), we can find no analogous requirement for negligent homicide, which does not depend on the conduct of another. *See*, *e.g.*, *State v. Mickens*, 123 S.W.3d 355, 369 (Tenn. Crim. App. 2003) (analyzing under criminal responsibility, noting that "the rule did not apply when the crime of which the defendant was convicted was the target crime itself and not some unintended collateral crime," and concluding that it did not apply to felony murder or when the "target" crime was the murder).

16

Here, the jury instructions required the jury to find that the Defendant should have been aware of a substantial and unjustifiable risk that the victim would be killed, such that his failure to perceive it was a gross deviation from the standard of care, and the instructions also required a finding that the victims were in an area in which a reasonable probability existed that the Defendant's conduct would place the victims in imminent danger of death or serious bodily injury. Although the Defendant's proposed instruction was certainly a correct statement of the law, the jury instructions given by the trial court conveyed that the death must be likely and foreseeable, which is the function of the "natural and probable cause" language in the context of negligent homicide. *See State v. Jones*, 151 S.W.3d 494, 502 (Tenn. 2004). Accordingly, the Defendant is not entitled to relief.

### III. Double Jeopardy

The defendant argues that his conviction for felony reckless endangerment violates the principles of double jeopardy and the Due Process Clauses of the United States and Tennessee constitutions. He contends that the verdicts for criminally negligent homicide and reckless endangerment are mutually exclusive verdicts that violate double jeopardy. He argues that because the jury found him not guilty of operating his vehicle recklessly in Count 1, they could not find him guilty of felony reckless endangerment based on the same conduct.

"Mutually exclusive verdicts" are "the type of inconsistent verdicts that occur 'where a guilty verdict on one count logically excludes a finding of guilt on the other.'" *State v. Davis*, 466 S.W.3d 49, 73 (Tenn. 2015) (quoting *United States v. Powell*, 469 U.S. 57, 69 n.8 (1984)). In *Davis*, our supreme court recently concluded that inconsistent verdicts and mutually exclusive verdicts were not a basis for setting aside a conviction. The court addressed the issue of inconsistent verdicts when the inconsistency was "between two convictions on alternative counts arising from a single criminal action." *Davis*, 466 S.W.3d at 76. The defendant was charged with alternative counts of first degree felony murder and first degree premeditated murder against the same victim. *Id.* at 53. The jury convicted the defendant of second degree murder as a lesser included offense of felony murder and of reckless homicide as a lesser included offense of premeditated murder. *Id.* The supreme court concluded that the defendant was not entitled to relief, emphasizing "that '[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" *Id.* at 77 (alterations in original) (quoting *United States v. Zane*, 495 F.2d 683, 690 (2d Cir. 1974)). The court opined that it was "disinclined to open the door to the increased confusion and increased litigation that arises from trying to parse a jury's inconsistent verdicts." *Id.*

17

In this case, as in *Davis*, there was an inconsistency between two convictions arising from the same criminal action.  By convicting the defendant of criminally negligent homicide as a lesser included offense of reckless vehicular homicide, the jury established that the defendant was not reckless in his operation of his motor vehicle.  However, in convicting the defendant of reckless endangerment, the jury necessarily found that the defendant acted recklessly in operating the motor vehicle.  While we agree with the defendant that these verdicts are inconsistent, we do not agree that the verdicts need be set aside.

The defendant argues that no speculation into the jury's reasoning is required because the reasoning must have been conditioned only on the element of recklessness.  While the element of recklessness may be the distinguishing *mens rea* element between criminally negligent homicide and reckless endangerment, it is unclear whether the jury's decision hinged on whether the defendant acted recklessly.  When a jury returns inconsistent verdicts, "'[t]he most that can be said in such cases is that the verdict shows that either in the acquittal or conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Wiggins v. State*, 498 S.W.2d 92, 93 (Tenn. 1973) (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932)).  A variety of reasons, such as a compromise or a mistake on the part of the jury, may be the cause of inconsistent verdicts.  *Id.*  As a result, this court "will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." *Id.* at 94.  As we concluded above, the evidence was sufficient to support the defendant's convictions for both criminally negligent homicide and reckless endangerment.  We conclude that he is not entitled to any relief.

### IV. Sentencing

The defendant contends that the trial court erred in denying him an alternative sentence.  He argues that he was a favorable candidate for alternative sentencing and that he established his suitability for probation.  He also contends that the trial court erred in imposing the maximum sentence of incarceration based on the need to avoid depreciating the seriousness of the offense and to effectively deter others from committing similar offenses.  Finally, he contends that the trial court erroneously applied several enhancement factors and did not provide meaningful consideration to all of the sentencing factors in Tennessee Code Annotated section 40-35-103.

The defendant argues that the trial court erroneously applied several enhancement factors.  He contends that the State presented no evidence of his conviction for "grand larceny" and that the trial court erred in finding that he had a history of criminal

18

convictions and criminal behavior. He argues that the trial court erroneously found that Ms. Hughes was particularly vulnerable due to her age. He also contends that the trial court erred in finding that the defendant possessed or employed a deadly weapon during the commission of the offense because the operation of a motor vehicle is a necessary element of reckless vehicular homicide.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.*

As an initial matter, we must address the defendant's claim that this court cannot consider the presentence report on appellate review. He argues that because the report was not entered into evidence or marked as an exhibit, this court cannot consider it. Our supreme court "has held that any matter that the trial court has appropriately considered is properly includable in the appellate record pursuant to Rule 24(g) of the Tennessee Rules of Appellate Procedure when the matter is 'necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.'" *State v. Smotherman*, 201 S.W.3d 657, 661 (Tenn. 2006) (quoting *State v. Housler*, 167 S.W.3d 294, 298 (Tenn. 2005)). At the conclusion of the trial, the court ordered the preparation of a presentence report. Trial counsel agreed that he was provided with a copy of this report and that the trial court received a copy. During the sentencing hearing, the trial court referenced the defendant's convictions and appeared to be reading from the presentence report, and the court stated that it considered the presentence report when imposing a sentence. The presentence report was not initially included in the technical record, but the defendant supplemented the record with the report that was file stamped by the criminal court clerk. The trial court clearly referenced the presentence report when imposing the defendant's sentence, and we conclude that it was properly included in the appellate record and may be considered on appellate review. *See Smotherman*, 201 S.W.3d at 661-62.

19

The defendant's presence report indicates that he had numerous convictions for traffic offenses, along with convictions for grand larceny and assault. At the hearing, the defendant testified that forty-seven years prior to the hearing, he was convicted of an offense after he purchased stolen tools, and he admitted that he had received multiple speeding tickets in the past. The record supports the finding of this enhancement factor. The trial court also found that Ms. Hughes was particularly vulnerable, citing to the fact that she may have survived her injuries had she been younger. At trial, Dr. Anderson testified that due to Ms. Hughes's age and the nature of her injuries, she had a mortality risk of sixty to seventy percent. One of the elements of criminally negligent homicide is death, and the record supports the finding that Ms. Hughes's chances of survival were significantly decreased due to her age. *See State v. Kissinger*, 922 S.W.2d 482, 487 (Tenn. 1996) (stating that this "factor may be used to enhance sentences when a victim's natural physical and mental limitations renders the victim particularly vulnerable for his or her age because of an inability to resist, a difficulty in calling for help, or a difficulty in testifying against the perpetrator"). Additionally, the trial court found that the defendant used a deadly weapon in the commission of the offense. While the use of a deadly weapon is not an element of criminally negligent homicide, *see* T.C.A., the use of a deadly weapon is an element of reckless endangerment. *See* T.C.A. § 39-13-103(b)(2). To the extent that the trial court utilized this factor to enhance the defendant's sentence for reckless endangerment, we conclude that the trial court erred. However, the misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. As we stated above, the trial court properly applied several other enhancement factors, and we conclude that the trial court properly imposed two-year sentences for each of the defendant's convictions.

The defendant next contends that the trial court erred when it denied him an alternative sentence. When imposing a sentence, the trial court should consider: (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in his own behalf about sentencing. T.C.A. § 40-35-210(b)(1)-(7) (2010). This court reviews the denial of an alternative sentence that falls within the appropriate range and reflects that the decision was based on the purposes and principles of sentencing under an "abuse of discretion standard, accompanied by a presumption of reasonableness." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). This court should uphold a sentence "so long as it is within the appropriate range and the record

demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

A defendant "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony[] should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6)(A). Here, the defendant was convicted of two Class E felonies and was sentenced as a standard offender. As a result, he was a favorable candidate for an alternative sentence.

A defendant who receives a sentence of ten years or less may be eligible for probation. T.C.A. § 40-35-303(a). However, the defendant bears the burden of establishing that he or she is a suitable candidate for probation. T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). In determining whether full probation is appropriate, the trial court "may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996).

In determining whether incarceration is an appropriate sentence, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1)(A)-(C). Additionally, the trial court should consider the defendant's potential or lack thereof for rehabilitation or treatment in determining whether an alternative sentence is warranted. T.C.A. § 40-35-103(5).

21

Here, the trial court imposed a sentence of incarceration based on the need to deter others from committing similar crimes and to avoid depreciating the seriousness of the offenses. The trial court "may sentence a defendant to a term of incarceration based solely on the need for deterrence when the record contains evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." *State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000). In *Hooper*, the Tennessee Supreme Court created a non-exhaustive list of factors to consider in determining whether deterrence was a proper basis to deny alternative sentencing: (1) whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole; (2) whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior; (3) whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case; (4) whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective; and (5) whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions. *Id.* at 10-12. If the trial court imposes a sentence of incarceration based on the seriousness of the offense, "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006). However, "the heightened standard of review that applies to cases in which the trial court denies probation based on only one of these factors is inapplicable" when the trial court relies on both the deterrent effect and the seriousness of the offense. *State v. Kyto Sihapanya*, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at \*3 (Tenn. April 30, 2014). Because the trial court relied on both factors, "we review the denial to determine if the trial court abused its discretion." *State v. Robert Allen Lester, Jr.*, No. M2014-00225-CCA-R3-CD, 2014 WL 5501236, at \*5 (Tenn. Crim. App. Oct. 31, 2014), *no perm. app. filed*; *see also Patrick James O'Brien, Jr.*, No. E2014-02248-CCA-R3-CD, 2015 WL 5179190, at \*4 (Tenn. Crim. App. Sept. 4, 2015) (citing to *Robert Allen Lester, Jr.*, and concluding that "if the trial court bases the denial of alternative sentencing on more than one factor, no additional findings are necessary, and we apply an abuse of discretion standard of review.") *no perm. app. filed*; *State v. William Avery Crisp*, No. M2013-01339-CCA-R3-CD, 2014 WL 3540646, at \*10-11 (Tenn. Crim. App. July 17, 2014), *no perm. app. filed*.

The trial court found that it would send "a terrible message" to grant the defendant complete probation. The court noted that the cause of the wreck was the defendant's desire to take a shortcut that brought him into oncoming traffic and that others needed to

22

be deterred from such behavior. The testimony at trial and the sentencing hearing showed that Ms. Hughes suffered immense physical pain before she passed away and that her age made her injuries far more likely to be fatal. The court also noted that taking a shortcut into the wrong lane was a maneuver that the defendant had completed "a thousand times before." Additionally, the court found that the defendant might continue to commit traffic offenses, as the defendant admitted that after the wreck, he was involved in two separate automobile accidents and received a speeding ticket. We conclude that the trial court did not abuse its discretion in denying the defendant an alternative sentence.

## CONCLUSION

Based upon the foregoing analysis, we affirm the judgments of the trial court. We remand for the entry of a judgment sheet showing that the defendant was convicted in Count 3 and that this conviction merged with the conviction in Count 2.

_____
JOHN EVERETT WILLIAMS, JUDGE